UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- x
CALICO COTTAGE, INC.,                                            :
                                                                 :
                    Plaintiff, Counterclaim-Defendant,           :
                                                                 :        **OPINION AND ORDER**
                    -against-                                    :        11-CV-0336 (DLI)(MDG)
                                                                 :
TNB, INC.,                                                       :
                                                                 :
                    Defendant, Counterclaim-Plaintiff,           :
                                                                 :
                                                                 :
----------------------------------------------------------------- x
**DORA L. IRIZARRY, United States District Judge:**

On January 21, 2011, plaintiff and counterclaim-defendant Calico Cottage, Inc. ("Calico" or "Plaintiff") commenced this diversity action against defendant and counterclaim-plaintiff TNB, Inc. ("TNB" or "Defendant"). (*See* Complaint, Doc. Entry No. 1.) On February 8, 2012, Defendant filed its Second Amended Answer, asserting five counterclaims against Plaintiff. (*See* Amended Answer to Complaint ("Am. Answer"), Doc. Entry No. 64.) Plaintiff now moves for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to the enforceability of the contract between the parties, and three of Defendant's counterclaims. Defendant also moves for summary judgment as to Plaintiff's liability in connection with each of Defendant's counterclaims and for summary judgment dismissing Plaintiff's complaint in its entirety. For the reasons set forth below, Plaintiff's motion for summary judgment is granted in part, and denied in part. Defendant's motion for summary judgment is denied in its entirety.

## I.     The Parties

Plaintiff Calico is a corporation organized and existing under the laws of the state of New York, having its principal place of business and manufacturing facility in Amityville, New York. (Plaintiff and Counterclaim-defendant Calico's Statement of Undisputed Facts ("Pl. 56.1"), Doc. Entry No. 86, ¶ 1; Response to Plaintiff's Rule 56.1 Statement of Undisputed Facts ("Def. 56.1 Resp."), Doc. Entry No. 98, ¶ 1.)   Plaintiff is in the wholesale fudge business, selling both products retailers need to make fresh fudge in the retailer's store, as well as finished fudge and make-at-home fudge mixes to retailers for resale under the retailer's own name or brand.  (Pl. 56.1 ¶ 2; Def. 56.1 Resp. ¶ 2.)  Defendant TNB is a corporation organized and existing under the laws of the state of Florida with a principal place of business in Sanford, Florida, and does business under the name "The Nutty Bavarian."  (Pl. 56.1 ¶4; Def. 56.1 Resp. ¶ 4.)  Defendant supplies products retailers need to prepare glazed nuts on their own premises.  (*Id.*)

## II.    The Discussed Merger

In the fall of 2006, the parties began discussing the possibility of entering into a partnership.  (Pl. 56.1 ¶10-11; Def. 56.1 Resp. ¶ 10-11.)  In order to facilitate the potential merger discussions, the parties entered into a contract entitled "Agreement of Non-Disclosure, Non-Use and Non-Competition" (the "Agreement"), effective January 30, 2007 and expiring January 29, 2012.  (*See* Declaration of Mark Wurzel ("Wurzel Decl."), Ex. 3, Doc. Entry No. 91.)  After entering into the Agreement, Defendant shared confidential information about its businesses with Plaintiff.  (Defendant TNB, Inc.'s Rule 56.1 Statement of Undisputed Facts ("Def. 56.1"), Doc. Entry No. 81, Ex. 4, ¶¶ 37-39; Plaintiff and Counterclaim-defendant Calico's

---

[1]        The following facts are undisputed, unless otherwise noted.

Response to TNB, Inc.'s Statement of Undisputed Facts ("Pl. 56.1 Resp.), Doc. Entry No. 83, Ex. 5. ¶¶ 37-39.)  On or around March 28, 2007, David Brent, TNB's President, had a meeting with Calico's management at Calico's facility in New York to discuss the possible merger.  (Pl. 56.1 ¶ 13; Def. 56.1 Resp. ¶ 13.)  The parties agree that Plaintiff disclosed to Mr. Brent certain financial and business information related it its business, but disagree as to the confidential nature of the information.  (*Id.*)  Shortly after this meeting, Mr. Brent decided to end the merger discussions on April 5, 2007.  (Pl. 56.1 ¶ 15; Def. 56.1 Resp. ¶ 15.)

**III.    The Agreement**

The Agreement contains a restrictive covenant, a non-competition provision that provides: "Each party agrees to refrain from entering into the business of the other party, said business being set above as Calico Business and Nutty Bavarian Business."  (Wurzel Decl., Ex. 3, ¶ 4.)  The Agreement also contains a second set of restrictive covenants regarding non-solicitation that provides:

> (a) During the term of this Agreement the parties shall not, directly or indirectly:
>   (i)   Employ or seek to employ an employee of the other party.
>   (ii)  Attempt to reduce or eliminate the current business relationship of the other party with any of the other party's customers.
> (b) For a period of one year from the effective date the parties shall not, directly or indirectly:
>   (i)   Engage the services or seek to engage the services of any representative of the other party without the express written consent of the other party.
>   (ii)  Attempt to solicit or sell products and services to a customer doing business with the other party by utilizing an employee or representative of the other party.

(*Id.* ¶ 3.)

The Agreement further provides that "[t]he parties each agree not to use any Confidential Information disclosed to it by the other party for its own use or for any purpose other than that related to said Business Purpose."  (*Id.* ¶ 2(a).)  The majority of the current dispute between the

parties pertains to whether either party breached the restrictive covenants within the Agreement by entering into the other party's business or improperly soliciting employees, representatives, or customers of the other party.

The Agreement defines Calico's business as "the business of providing to retailers: (i) fudge making equipment, fudge making ingredients and finished fudge that enables retailers to sell fudge to consumers and (ii) make-at-home mixes that are sold by retailers to consumers ('Calico Business')." (*Id.* at 1, first Whereas clause.) The Agreement defines TNB's business as "the business of providing to retailers: (i) nut roasting and glazing equipment and ingredients for roasting and glazing nuts that enables retailers to sell roasted and glazed nuts to consumers, and (ii) glazed nuts in bulk and prepackaged glazed nuts that are sold by retailers to consumers ('Nutty Bavarian Business')." (*Id.* at 1, second Whereas clause.)

Lastly, paragraph 3(b) of the Agreement prohibits each party from directly or indirectly engaging "the services or seek[ing] to engage the services of any representative of the other party" without written consent, and from attempting "to solicit or sell products and services to a customer doing business with the other party by utilizing an employee or representative of the other party" for one year from the effective date of the Agreement. (Wurzel Decl., Ex. 3, ¶ 3(b).) On July 29, 2008, Robyn Taylor, a Calico employee, sent the following email to Calico's individual sales representatives:

> "I understand that there may be some current confusion in the field as to whether or not Calico Representatives can also represent certain lines. This email is to clarify what type of products would be in direct conflict with your Calico Independent Representative Agreement. Your agreement states in section 10c that you cannot promote any competing product which includes any other fudge making equipment, fudge ingredients, finished fudge and any product that has a "made on premises" customer appeal. For example, The Nutty Bavarian nut program would fall under this 'made on premises' customer appeal category."

(Wurzel Decl. Ex. 7.)

**IV.    Disputed Domain Names**

In February 2011, Plaintiff registered various Internet domain names that included the words "nuttybavarian" and "nuttyb" ("Disputed Domain Names").[2]  (Pl. 56.1 ¶ 77; Am. Compl. ¶¶ 31-39, 41-45.)   At some point in 2011, Plaintiff linked these registered Disputed Domain Names to Plaintiff's website and other domain names registered to, or affiliated with, Plaintiff. (*See* Pl. 56.1 ¶ 79; Def. 56.1 Resp. ¶ 79.)   When Defendant complained to Plaintiff about Plaintiff's registration of the Disputed Domain Names on August 30, 2011, Plaintiff offered to transfer the disputed domain names to Defendant, but Defendant declined the offer.  (Pl. 56.1 ¶ 80; Def. 56.1 Resp. ¶ 80.)   Plaintiff then relinquished its ownership of the Disputed Domain Names on September 7, 2011.  (*See* Pl. 56.1 ¶ 80; Def. 56.1 Resp. ¶ 80.)  Several of Defendant's counterclaims arise from Plaintiff's registration and use of these Disputed Domain Names.

**DISCUSSION**

**I.    <u>Legal Standard</u>**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial."  *McCarthy v. Dun & Bradstreet Corp*., 482 F. 3d 184, 202 (2d Cir. 2007) (internal quotations omitted).  A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such

---

[2]    Plaintiff registered the following domain names: nuttybavarian.co, nuttybavarian.us, nuttybavarianfudge.com, nuttybavarianfudge.net, nuttybfudge.com, and nuttybfudge.net.

that a reasonable jury could return a verdict for the nonmoving party." *Id*. To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F. 3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F. 2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F. 2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F. 3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

II.   **Analysis**

A.   **Plaintiff's Claims**

Plaintiff alleges that Defendant breached the non-competition and non-solicitation provisions of the Agreement by offering free cases of, and later selling, fudge mixes to Cabela, a retail chain and a long-time customer of Plaintiff. (*See* Plaintiff Calico Cottage, Inc.'s Memorandum in Support of its Motion for Partial Summary Judgment ("Pl. Memo in Support"), Doc. Entry No. 85 at 5.)  Plaintiff moved for summary judgment on these two claims of breach of contract.  Defendant contends that summary judgment should be granted in its favor on these claims because: (a) the Agreement is unenforceable against Defendant due to a lack of consideration, and (b) the non-competition and non-solicitation provisions of the Agreement are unenforceable against Defendant, because these restrictive covenants violate New York law. (*See generally* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. Memo"), Doc. Entry No. 97.)  The Agreement provides that the laws of New York apply to any disputes regarding the Agreement. (Wurzel Decl., Ex. 3, ¶ 6.)

1)   *The Agreement is Supported by Consideration*

Under New York law, consideration is defined as "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." *Hamer v. Sidway*, 124 N.Y. 538, 545 (1892) (internal quotations omitted).  Consequently, "[i]t is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him." *Anand v Wilson*, 32 A.D. 3d 808, 809 (2d Dep't 2006); *see also Weiner v McGraw-Hill, Inc.*, 57 N.Y.2d

458, 464 (1982) (noting consideration "consists of either a benefit to the promisor or a detriment to the promise").  Moreover, it is not the province of the courts to delve into the adequacy or value of the consideration.  *See Caisse Nationale De Credit Agricole-CNCA v. Valcorp, Inc*., 28 F. 3d 259, 265 (2d Cir. 1994) ("It is well established that the slightest consideration is sufficient to support the most onerous obligation and that the courts are not to inquire into the adequacy of consideration.") (internal quotation omitted).

Defendant's assertion "that the Agreement was not supported by consideration and/or there was a failure of consideration because Plaintiff did not provide any confidential information to [Defendant] during the brief period of merger discussions" is unsupported.  (Def. Opp., 14.)  Here, the Agreement was supported, *inter alia*, by the promise of each party not to enter the other's business for five years in order to facilitate discussions in contemplation of a possible merger.  (Wurzel Decl., Ex. 3, ¶ 4.)  Whether the parties did in fact share confidential information between each other is irrelevant to gauging whether each party did in fact promise not to engage in behavior it otherwise was legally permitted to, in return for a similar promise. As the parties exchanged promises not to engage in certain behavior, the Agreement is supported by consideration.

### 2)  *Restrictive Covenants in the Agreement*

Defendant next argues that the restrictive covenants are not enforceable as a matter of law.  "Under New York law, the enforceability of a restrictive covenant depends in part upon the nature of the underlying contract."  *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 198 (E.D.N.Y. 1999).  Restrictive covenants usually arise in one of three circumstances: (1) those ancillary to the sale of a business; (2) in employment agreements; and (3) as part of ordinary commercial contracts.  *Id.* at 196-197.  Courts within this circuit "analyze restrictive

covenants in ordinary commercial contracts . . . 'under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract.'" *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (quoting *DAR & Assocs., Inc.*, 37 F. Supp. 2d at 197).

In applying this rule of reason to this case, the issues for consideration are: (1) whether Plaintiff has demonstrated a legitimate business interest that warrants the enforcement of the restrictive covenants; (2) the reasonableness of the covenants with respect to geographic scope and temporal duration; and (3) the degree of hardship that enforcing these covenants would inflict upon Defendant, bearing in mind the degree to which Defendant consciously agreed to bear the risk of such hardship when it entered into the Agreement with Plaintiff. *See DAR & Assocs., Inc.*, 37 F. Supp. 2d at 197-198; *see also American Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F. 2d 382, 387 (2d Cir. 1982) ("Only after determining that a restrictive covenant would serve to protect against . . . 'unfair and illegal conduct,' and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its 'time, space or scope,' or the oppressiveness of its operation become an issue.").

In determining whether a restrictive covenant in an ordinary commercial contract is enforceable, the Court is mindful that "[r]estrictive covenants in employment agreements receive very different treatment." *Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, 2008 WL 207843, at *9, fn. 21 (E.D.N.Y. Jan. 24, 2008) *order aff'd and remanded*, 282 F. App'x 885 (2d Cir. 2008). In examining restrictive covenants in employment agreements, courts adopt a more rigorous approach because there are "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.*, 42 N.Y.2d 496, 499 (1977). In contrast, where two business entities agree to a restrictive

covenant, there is generally no concern about the loss of individual's livelihood or an imbalance of bargaining power "that would implicate New York's public policy disfavoring restrictive covenants." *See Nat'l Elevator Cab & Door Corp.*, 2008 WL 207843, at *9, fn. 21. Accordingly, the cases Defendant cites regarding restrictive covenants in an employment context are generally inapposite. (*See* Def. Memo in Support at 12-14); *see also Nat'l Elevator Cab & Door Corp.*, 2008 WL 207843, at *9, fn. 21 ("The cases defendant has cited concerning non-solicitation or non-compete covenants in the employment context are therefore of little value here.").

Here, the parties entered into an agreement that contemplated disclosure of confidential business information during planned merger discussions. Under the Agreement's protection, the parties shared information about their business operations with each other. Defendant showed Plaintiff confidential information about its business, including sales, expenses, profit, revenue, company operation, equipment, wages and bad debt to keep. (*See* Def. 56.1 ¶¶ 37-40; Affidavit of David Brent in Opposition to Plaintiff's Partial Motion for Summary Judgment ("Brent Opp. Aff."), Doc. Entry 99, ¶¶ 23-25.) Also, after the effective date of the Agreement, Plaintiff made a presentation to Defendant that included spreadsheets containing financial and sales data of both companies. (*See* Pl. 56.1 ¶¶ 13-14; Def. 56.1 Resp. ¶¶ 13-14; s*ee also* Declaration of Ronald Beilin ("Beilin Decl."), Doc. Entry 92 at 2.) The parties disagree as to whether Plaintiff shared any confidential information about its business with Defendant. (*See* Pl. 56.1 ¶ 13; Def. 56.1 Resp. ¶ 13.)

The parties also sharply dispute whether the restrictive covenants protect a "legitimate business interest" of Plaintiff. One legitimate business interest is the "prevention of unfair competition, 'a malleable tort that includes any misappropriation for commercial advantage of a

benefit or property right belonging to another.'" *DAR & Assocs., Inc.*, 37 F. Supp. 2d at 198

(citing *Baker's Aid v. Hussmann Foodservice Company*, 730 F. Supp. 1209, 1215 (E.D.N.Y.

1990)). Because the information the parties shared with each other was non-public information,

Plaintiff contends it possesses an interest in its financial and sales data that warrants protection

through restrictive covenants in order to prevent unfair competition. (*See* Pl. Memo in Support

at 14.) Defendant contends that Plaintiff does not have a legitimate business interest here

because the information that Plaintiff provided Defendant was not the sort of information "that

could allow it to unfairly compete with Plaintiff." (Def. Opp. Memo at 12.) Defendant

concedes, however, that Plaintiff disclosed spreadsheets to Defendant detailing information

about Plaintiff's business. (*See* Brent Opp. Aff. ¶ 26; *see also* Beilin Decl. at 2.)

Under the simple rule of reason, the Court is required to balance the competing public

policies in favor of robust competition and freedom to contract. *See Design Strategy Corp. v.

Knack Sys., LLC*, 2007 WL 4562926, at *3 (S.D.N.Y. Dec. 18, 2007). As Plaintiff's primary, if

not sole, negotiator during the merger discussions between the parties, Ronald Beilin, stated, "the

purpose of this non-compete provision was to minimize the competitive advantage obtained by

each party *as a result of learning about the other's business from the confidential information

shared under the Agreement during the negotiations*, in the event the negotiations were

ultimately unsuccessful." (*See* Ex. I to Def. 56.1 ¶ 10 (emphasis added).) This view comports

with the legitimate business interest in the "prevention of unfair competition" that Plaintiff

asserts warrants enforcement of the covenants. *See DAR & Assocs., Inc.*, 37 F. Supp. 2d at 198

(noting that a protectable business interest may include prevention of unfair competition).

Problematically, Plaintiff has not presented any facts, much less undisputed facts, that

firmly suggest Defendant engaged in any *unfair* competition when it solicited business from

Cabela, or otherwise tried to sell fudge, within the five-year period. The parties held a meeting on March 28, 2007 at Plaintiff's office. Before this meeting, Defendant shared a variety of information with Plaintiff that arguably could form the basis of a protectible business interest. At the meeting, Plaintiff's presentation to Defendant included various spreadsheets containing financial and sales data, five of which Plaintiff submitted to the Court. (*See* Beilin Decl., Ex. 1-5.) These spreadsheets included, *inter alia*, the potential combined profitability of the parties for three years ending in 2009, the parties' pre-tax profits for 2006, a chart listing the parties' sales to customers they had in common, and an analysis of Plaintiff's customers for fudge mix by size of sales and the customers that were common to the parties in each size category. (*Id.*)

There would be unfairness here if, in contravention of the non-compete provision, Defendant wrongfully exploited this information in competing against Plaintiff for Cabela's business related to fudge mix. Similarly, there would be unfairness if Plaintiff, as Defendant alleges, breached the non-compete provision of the Agreement by wrongfully exploiting shared information when selling nut products to Defendant's customers and other retailers during the term of the Agreement. Throughout its voluminous submissions, Plaintiff does not make any clear assertions of how the information it provided Defendant would allow Defendant to unfairly compete with Plaintiff. Instead, Plaintiff's argument can be summarized as follows: the parties agreed to a non-compete for five years in order to facilitate merger discussions, Plaintiff shared what it considers to be confidential information, and Defendant did in fact compete within that five-year period; therefore, Defendant is liable. Plaintiff skips the critical step of connecting the disclosed information with the subsequent, alleged unfair competition.

Public policy considerations require the Court to look deeper than whether there was a literal contract breach, and to analyze the reasonableness of enforcing a restrictive covenant

under the specific facts of the case at hand and in light of public policy concerns.  Certainly this Court would not enforce such a restrictive covenant, if the parties had signed the overarching agreement, but never, in fact, discussed anything business-related or shared any information of any sort.[3]  Such a hindrance on competition would directly contravene public policy in favor of robust competition.  There must be some allegation that plausibly characterizes the competition as unfair and not just unwelcomed, otherwise the Court's obligation to balance the competing public policies in favor of robust competition and freedom to contract has no meaning.

The Court is well aware that "[t]he reasonableness of the restrictive covenant must be assessed in light of the fact that it was negotiated by sophisticated business[men]." *Spherenomics Global Contact Ctrs. v. Vcustomer Corp.*, 427 F. Supp. 2d 236, 250 (E.D.N.Y. 2006).  Further, the Court is not convinced by Defendant's suggestion that its agents, namely Mr. Brent, TNB's President, were manipulated or coerced into agreeing to the restrictive covenants in the Agreement.  (*See* Affidavit of David Brent in Support of TNB., Inc.'s Motion for Summary Judgment ("Brent Aff. In Support"), Doc. Entry No. 81, Exh. 1, ¶ 11 (alleging that Mr. Brent was not represented by counsel when Plaintiff drafted Agreement, or advised by Plaintiff to obtain counsel")).  The Court finds this suggestion simply is unsupported and far-fetched, especially considering that Mr. Brent worked for NASA as an aeronautical engineer before

---

[3]    Though courts scrutinize restrictive covenants within employment agreements differently from those in ordinary commercial contracts, the analysis utilized with the former can be illustrative when analyzing the latter.  As one court explained, "where an employer proffers protecting customer goodwill as the legitimate interest it seeks to protect with a restrictive covenant, the covenant must actually protect that interest. A broad non-compete that baldly prevents competition will not be enforced, particularly where the employer is already protected by a non-solicitation agreement." *Veramark Techs. Inc. v. Bouk*, 2014 WL 1364930 (W.D.N.Y. Apr. 2, 2014) (citing *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388-89 (1999) (noting that restraint will only be considered reasonable if it is "no greater than is required for the protection of the legitimate interest of the employer").  While the situation with the ordinary commercial contract is not analogous, the concern regarding unnecessarily expansive restrictions remains present.

purchasing TNB with partners in 1994.  (*See* Pl. 56.1 ¶ 7; Def. 56.1 Resp. ¶ 7.)  Defendant cannot claim plausibly that it "lacked any meaningful choice with regard to accepting [the Agreement]."  *Spherenomics*, 427 F. Supp. 2d at 250.  In reality, "[t]he parties to this agreement are both sophisticated business entities, capable of understanding the terms and implications of this Agreement and making an informed decision as to its risks and benefits."  *Nat'l Elevator Cab & Door Corp.*, 2008 WL 207843, at *9, fn. 21.

Even in finding that the Agreement was the result of a fair negotiation between sophisticated parties, the factual nexus is not present here to support a finding that Plaintiff had a legitimate business interest with regard to the information it shared with Defendant that would warrant restricting robust competition between the parties by enforcing the covenants.  *See Design Strategy Corp.*, 2007 WL 4562926, at *3 (denying both parties' summary judgment motions regarding restrictive covenant because undisputed facts did not resolve causation issue between shared information and unfair competition).  The undisputed facts set forth above do not resolve the causation issue as to how the information shared by Plaintiff plausibly allowed Defendant to unfairly compete.  Both parties' summary judgment motions are denied in so far as they relate to the enforceability of both restrictive covenants.

### B.     Defendant's Counterclaims

Defendant asserts several counterclaims.  First, Defendant alleges that Plaintiff violated the Lanham Act, 15 U.S.C.A. § 1125, by purchasing and/or registering, in its own name, several domain names containing the words "nuttybavarian" or "nuttyb."  (Am. Answer ¶¶ 32-45.)  Defendant claims that Plaintiff automatically redirected these websites to Plaintiff's own website (first counterclaim) and Plaintiff had a bad faith intent to profit from Defendant's distinctive mark (second counterclaim).  (*Id.*)  Second, Defendant alleges that Plaintiff breached the non-

solicitation and non-competition provisions of the Agreement by: (1) selling nut products to Defendant's current customers and other retailers during the term of the Agreement (third counterclaim), and (2) purchasing/registering TNB-related domain names and redirecting them to Plaintiff's own website (fourth counterclaim). (*Id.* ¶¶ 46-62.) Third, Defendant alleges that Plaintiff breached Paragraph 3(b) of the Agreement by instructing its independent sales representatives that they could not represent Defendant while representing Plaintiff, even though the one-year term of the provision had expired (fifth counterclaim). (*Id.* ¶ 69.) Defendant moved for summary judgment on all of its counterclaims, while Plaintiff moved for summary judgment on Defendant's third, fourth and fifth counterclaims.

**1)** ***Defendant's First Counterclaim regarding the Lanham Act***

It is undisputed that Plaintiff purchased and registered, in its own name, several domain names containing the words "nuttybavarian" or "nuttyb," and automatically redirected these websites to Plaintiff's own website. (*See* Pl. 56.1 ¶ 79; Def. 56.1 Resp. ¶ 79.) Defendant contends that since Plaintiff does not dispute registering the TNB-related domain names, it is, therefore, an issue of law for the court to determine whether these acts constituted an infringement claim in violation of 15 U.S.C.A. § 1125(a). (*See* Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Def. Memo in Support"), Doc. Entry No. 81 at 16.) Plaintiff disagrees and argues that Defendant fails to establish the absence of any issue of material fact related to its Lanham Act claims. (*See* Plaintiff Calico Cottage, Inc.'s Memorandum in Opposition to Defendant TNB's Motion for Summary Judgment ("Pl. Memo in Opp."), Doc. Entry No. 83 at 21-24.)

"To prevail on a Lanham Act infringement claim, a plaintiff must [] show that 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'"

*GC Property v. Wainscott/Sagaponack Property Owners, Inc.*, 250 F. Supp. 2d 136, 142 (E.D.N.Y. 2003) (citing 15 U.S.C. § 1125(a)(1)(A)). In deciding whether a plaintiff has "established likelihood of confusion, courts must consider the eight factors that were outlined in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F. 2d 492, 495 (2d Cir. 1961): (1) strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will 'bridge the gap'; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers." *GC Property*, 250 F. Supp. 2d at 142.

Defendant, as a counter-claim plaintiff, has failed to plead sufficient undisputed facts to establish that it both possess a valid mark entitled to protection and that Plaintiff's registration and use of the Disputed Domain Names was likely to cause confusion. Defendant's scant analysis, which is limited to labeling the Disputed Domain Names as "TNB-themed" and noting Defendant's long-standing use of the name, "The Nutty Bavarian," is inadequate in order to prevail at the summary judgment stage. (*See* Def. Memo in Support at 17.)

Within the Second Circuit, "[t]he degree to which a mark is entitled to protection under the Act depends on whether the mark is classified as (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." *Estee Lauder v. Gap, Inc.*, 108 F. 3d 1503, 1508 (2d Cir. 1997). Further, "[a] mark is classified as descriptive if it 'tells something about a product, its qualities, ingredients or characteristics.'" *Id.* at 1508 (citing *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F. 2d 1072, 1076 (2d. Cir. 1993). As the Second Circuit explained, "[a] descriptive mark generally 'may be protected only if it has acquired secondary meaning.'" *Gruner + Jahr USA Publishing*, 991 F. 2d at 1076. Such a secondary meaning attaches to a mark only when 'the consuming public primarily associates the term with a particular source.'" *Bristol-Myers*

*Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F. 2d at 1040; *see*, *e.g.*, *Arrow Fastener Co. v. Stanley Works*, 59 F. 3d at 390 (secondary meaning attaches when "the [term] and the business have become synonymous in the mind of the public" (internal quotation marks omitted)). While Defendant's alleged protecible mark apparently should be classified as "descriptive," Defendant surprisingly offers no arguments as to how its alleged marks should be classified, whether descriptive or otherwise.

Regardless of whether Defendant's mark is entitled to protection, under the Second Circuit's *Polaroid* analysis, "summary judgment based on likelihood of confusion is appropriate where 'the undisputed evidence would lead only to one conclusion.'" *The Sports Authority, Inc. v. Prime Hospital Corp.*, 89 F. 3d 955, 960 (2d Cir. 1996) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F. 3d 474, 478 (2d Cir. 1996)). The Second Circuit has admonished: "'If a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment.'" *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F. 3d 209, 215 (2d Cir. 2003) (quoting *Cadbury Beverages, Inc.*, 73 F. 3d at 478).

Here, with only a cursory analysis, Defendant asserts in equally conclusory fashion that "Plaintiff's use of the mark by registering TNB-themed domain names and linking those domain names to Plaintiff's website is likely to cause confusion as to the origin or sponsorship of the defendant's goods, as it will create the false impression that TNB's goods originate from or are associated with Plaintiff." (Def. Memo in Support at 17.) Defendant failed to analyze the *Polaroid* factors in the context of its claim. As such, a trial is necessary to assess and weigh the *Polaroid* factors, which are material issues of fact. Defendant's motion for summary judgment on its first counterclaim is denied.

### 2) *Defendant's Second Counterclaim regarding the Lanham Act*

Defendant's second counterclaim against Plaintiff asserts a cause of action for violations of the Anti-Cybersquatting Protection Act ("ACPA"), 15 U.S.C. § 1125(d)(1). The ACPA was passed "to protect consumers and American businesses . . . by prohibiting the bad-faith and abusive registration of distinctive marks--as Internet domain names with the intent to profit from the goodwill associated with such marks--a practice commonly referred to as cybersquatting." *Sporty's Farm LLC v. Sporty's Market Inc.*, 202 F. 3d 489, 495 (2d Cir. 1998). "To successfully assert a claim under the ACPA, a plaintiff must demonstrate that: (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from that mark." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 324 (S.D.N.Y. 2010) (citing 15 U.S.C. § 1125(d)(1)); *Sporty's*, 202 F. 3d at 497-99.

The Court finds that an issue of material fact exists as to whether Plaintiff acquired the Disputed Domain Names in bad faith with the intent to profit from Defendant's purported mark. As the Second Circuit has held, the issue of a party's intent "is best left in the hands of the trier of fact." *Sports Auth.*, 89 F. 3d at 964; *see also Lang v. Retirement Living Pub. Co.*, 949 F. 2d 576, 583 (2d Cir. 1991) (noting that "issues of good faith are generally ill-suited for disposition on summary judgment"). Defendant has failed to present sufficient undisputed facts to establish Plaintiff's *men rea*. Accordingly, Defendant's motion for summary judgment on its cybersquatting claim is denied.

### 3) *Defendant's Third and Fourth Counterclaims regarding the Restrictive Covenants*

Defendant contends, that if the restrictive covenants are enforceable, they are enforceable against Plaintiff, not Defendant. (*See* Am. Answer ¶ 47.) Defendant maintains that Plaintiff breached the Agreement's non-solicitation and non-competition provisions by selling nut products to various customers, including those of Defendant. (*Id.* ¶ 50-55.) Similarly, Defendant alleges that Plaintiff breached the non-solicitation of the Agreement by registering the Disputed Domain Names and linking those to Plaintiff's website. (*Id.* ¶ 59-62.) Just as Plaintiff's summary judgment motion for Defendant's alleged violation of the non-compete and non-solicitation restrictive covenants must be denied, so to must Defendant's summary judgment motion on these grounds be denied, and for the same reasons. *See supra* pp. 8-14.

As part of its third and fourth counterclaims, Defendant also alleges that Plaintiff's purported sale of nut products and use of the Disputed Domain Names constituted a breach of an implied covenant of good faith and fair dealing. (*See* Am. Answer ¶¶ 53, 60.) Defendant's claim of a breach of an implied covenant is based on the same conduct that Defendant claims violate the Agreement's non-solicitation and non-competition provisions in these same counterclaims. "A claim for breach of an implied covenant will be dismissed as redundant where the same conduct is the predicate for an alleged breach of an express provision of the underlying contract." *See ICD Holdings S.A. v. Frankel,* 976 F. Supp. 234, 243-244 (S.D.N.Y. 1997). (internal quotation omitted). Accordingly Defendant's counterclaims of a breach of an implied covenant in its third and fourth counterclaims are dismissed.

### 4) *Defendant's Fifth Counterclaim for Breach of the Covenant of Good Faith and Fair Dealing*

Paragraph 3(b) of the Agreement established a one-year moratorium on each party attempting to hire each other's independent sales representatives, after which the parties were free to try to recruit each other's sales representatives. (*See* Wurzel Decl., Exh. 3, ¶ 3(b)(i).)[4] Defendant alleges that Plaintiff breached the Agreement's implied covenant of good faith and fair dealing by instructing its independent representatives that they could not represent Defendant while representing Plaintiff, even though the one-year term of the provision had expired. (*See* Wurzel Decl., Ex. 7.) Plaintiff responds that its actions were permissible and that the Agreement's implied covenant of good faith and fair dealing does not extend as far as to require Plaintiff to act against its own interests and allow its representatives to represent Defendant simultaneously. (Pl. Memo in Opp. at 18.) The Court agrees with the Plaintiff's assessment.

Under New York law, a covenant of good faith and fair dealing is implied in every contract. *See Travellers Int'l, A.G. v Trans World Airlines. Inc.*, 41 F. 3d 1570, 1575-77 (2d Cir. 1994). A breach of the covenant of good faith and fair dealing occurs "where the contract is not technically breached, but one party has acted to destroy or injure the right of the other party to receive the benefit of the contract." *Witherspoon v. Rappaport*, 65 Fed. Appx. 356, 359 (2d Cir. 2003). However, "[t]he scope of potential liability for breach of the covenant is quite narrow: such a breach cannot give rise to additional liability if it merely replicates the liability for breach of the underlying contract, nor can it create new contractual rights or impose additional duties."

---

[4]    Paragraph 3(b) of the Agreement, also known at the Representative Protection Provision, provides in relevant part: "<u>Non-Solicitation.</u> . . . For a period of one year from the effective date the parties shall not, directly or indirectly: (i) Engage the services or seek to engage the services of any representative of the other party without the express written consent of the other party. (ii) Attempt to solicit or sell products and services to a customer doing business with the other party by utilizing an employee or representative of the other party."

*Id.* (internal citations omitted). Consistent with this limited scope, "[t]he implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F. 3d 187, 198-199 (2d Cir. 2005) (internal citation omitted).

Here, regardless of whether the restrictive covenants within the Agreement are enforceable, the Defendant's invocation of the implied covenant of good faith and fair dealing is misguided and does not give rise to a cause of action as a matter of law. This implied covenant cannot transform a limited one-year prohibition on the parties seeking to employ each other's employees to an extended prohibition on each party from directing its own representatives about the scope of their previously agreed-to employment contracts. Plaintiff's directive to its representatives did not destroy Defendant's bargained-for-rights in the Agreement, which protected each party against the poaching of each other's employees for one year. This provision does not purport to impose the obligation that each party must facilitate, or even refrain from obstructing, such poaching after the one-year period. Defendant received the benefit of this provision and cannot now seek to employ this provision to punish the Plaintiff for reasonably acting in its own interests.

Separately, Defendant has not alleged facts showing that Plaintiff acted with any bad faith in directing its representatives about which types of products they could not represent while under their Calico Independent Representative Agreement, which is the agreement between Plaintiff and its independent representatives. (*See* Wurzel Decl., Ex. 7.) Within the very email cited by Defendant, Plaintiff notes a specific provision of this agreement that provides a seemingly legitimate basis for Plaintiff's directive to its representatives. Notably, there are no indicia of bad faith within this email. *See Hunter v. Deutsche Bank AG, New York Branch*, 56

A.D.3d 274, 274 (1st Dep't 2008) (granting summary judgment on the claim of breach of the implied covenant of good faith and fair dealing based on lack of evidence of bad faith). Accordingly, Plaintiff is entitled to summary judgment with respect to Defendant's fifth counterclaim based on the implied covenant, which is hereby dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted to the extent that the Court finds there is consideration in support of the Agreement. Plaintiff's motion is denied in all other respects. Defendant's third, fourth, and fifth counterclaims with regard to the implied covenant of good faith and fair dealing are dismissed. Defendant's motion for summary judgment is denied in all other respects. As for other defenses put forward by the parties regarding attorney's fees, failure to mitigate, and the doctrines of waiver, ratification, estoppel and/or laches, the Court concludes that those issues are sufficiently intertwined with the unresolved issues as not to be determinable at this stage. This case shall proceed to trial on the remaining issues.

SO ORDERED.

DATED:  Brooklyn, New York
        September 29, 2014

_____/s/_____

DORA L. IRIZARRY
United States District Judge